IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America          :
                                  :    Case No. 1:08-cr-087
                                  :
                                  :    Chief Judge Susan J. Dlott
        v.                        :
                                  :    ORDER DENYING
David Lee,                        :    DEFENDANT'S MOTION
                                  :    TO SUPPRESS
        Defendant.                :

This matter comes before the Court on Defendant David Lee's Motion to Suppress Evidence (doc. 17). The Court held a hearing on the motion on January 8, 2009. The matter is now ripe for review. For the reasons that follow, the Court **DENIES** Defendant's motion.

## I. FACTUAL BACKGROUND

Lee was arrested at approximately 3:30 a.m. on May 10, 2008 and subsequently charged with one count of being a felon in possession of a weapon in violation of 18 U.S.C. § 922. On the morning Lee was arrested, Cincinnati Police Officer Timothy Lanter and his partner were on a routine patrol when they received a "shots fired" call on the radio.[1] Persons from multiple locations called 911 and reported shots fired in the vicinity of Grand Avenue and Westwood in Cincinnati, Ohio. (Gov't Ex. 1.) Subsequent callers reported shots fired on nearby Montrose

---

[1] Cincinnati Police Officer Timothy Lanter was the only witness to testify on behalf of the Government at the suppression hearing.

Street, and a caller at a residence on Montrose Street reported that a subject standing by a vehicle in the middle of the street had just fired off several shots. (*Id.*)

Officer Lanter and his partner were traveling southeast on Harrison Avenue in their car when they received the "shots fired" call. Officer Lanter turned right onto Montrose Street and proceeded west down the narrow street. Although he had his high-beam headlights on, Officer Lanter did not activate the cruiser's overhead lights. As Officer Lanter drove slowly down Montrose, he observed a maroon Cadillac parked on the street and facing east, toward him. Officer Lanter observed two passengers in the Cadillac and another person standing near the car. Officer Lanter testified that the individual sitting in the driver's seat, who he later learned was Defendant Lee, exited the Cadillac and proceeded into the house located at 1691 Montrose. The individual in the front passenger seat of the Cadillac exited the car and hung out near it; the third individual stayed where he was, on the north side of the street near the car. Officer Lanter stopped his cruiser just short of the Cadillac and got out of the cruiser, as did his partner.

Officer Lanter testified that he decided to pursue Lee because of Lee's activity. Specifically, Officer Lanter testified that he thought Lee might have been engaged in criminal activity because he made a move to exit the Cadillac as soon as he saw the officers and that he "high-stepped it" into the house when the cruiser pulled up. Officer Lanter then walked to the front door of 1691 Montrose Street while his partner stood next to the Cadillac near the other two individuals. Officer Lanter knocked on the door of 1691 Montrose Street, and a female later identified as Alysia Elliott answered the door. Officer Lanter testified that he asked Elliott for the man who had just entered the house. Elliott left the doorway, went back into the house, and returned with Lee a few minutes later.

2

Officer Lanter told Lee that he was investigating reports of shots fired in the area. He asked Lee to come out of the house and walk with him to the Cadillac, which Lee did voluntarily, and the officer asked Lee to stand in front of the Cadillac. Officer Lanter testified that, although he could not recall if the Cadillac's engine was running, the keys were in the ignition and the radio was on.

While Lee was standing in front of the Cadillac, Officer Lanter proceeded to walk around the Cadillac while shining his light into the vehicle's windows. Officer Lanter testified that he decided to walk around the car because the call stated that the shots came from beside a car. When he rounded the back of the Cadillac and began to walk alongside the driver's side of the vehicle, Officer Lanter observed in plain view a Norinco Model SKS semi-automatic rifle lying on the rear floor of the vehicle. The rifle had an ammunition clip in it. The officer testified that it is illegal to transport a loaded weapon in a vehicle that way.

Officer Lanter then handcuffed Lee and informed him of his *Miranda* rights, which the officer recited from memory. Lee orally indicated that he understood his rights. Officer Lanter testified that he placed Lee in custody for the officers' safety and to further the investigation. Officer Lanter then placed Lee in the back of the police cruiser and proceeded to ask him questions. He did not ask Lee if he wished to waive his *Miranda* rights.

Officer Lanter testified that he asked Lee about the rifle and that Lee responded, "it's not mine. You can't put that on me. I didn't shoot it." Officer Lanter then told Lee that he was going to give Lee a gunshot residue ("GSR") test, and Lee said to go ahead, that he would pass the test. Another officer then administered the GSR test on Lee, which test did not reveal any

gunshot residue on Lee's hands. Officer Lanter testified that Lee was taking a "defensive stance" during this questioning and that Lee denied having been in the Cadillac.

After talking with Defendant, Officer Lanter talked to Elliott, the homeowner, and the other two men who were near the car. Officer Lanter testified that Elliott told him that the Cadillac was hers but that Lee had been driving it for at least a month. Elliott also testified that she saw Lee in the driver's seat. Elliott told Officer Lanter that her boyfriend was one of the passengers in the Cadillac; the boyfriend also told Officer Lanter that Lee had been in the driver's seat. At some point during the investigation, Officer Lanter removed the rifle from the Cadillac. It was loaded and ready to fire.[2]

Officer Lanter testified that approximately ten minutes after he arrived on Montrose Street, a call came in that a bullet had penetrated the wall of the residence at 1695 Westwood. Officers other than Lanter responded to that location, took photographs, and recovered a bullet. (Gov't Ex. 4A (photograph showing window where bullet entered residence); Gov't Ex. 4B (photograph showing mirror inside residence that had been shattered by a bullet)). Officer Lanter testified that all officers then responded to the district, worked on paperwork concerning

---

[2] The Government introduced into evidence the SKS Norinco Rifle that Officer Lanter saw in the Cadillac (Gov't Ex. 3A), the high-capacity magazine that was in the rifle (Gov't Ex. 3B), and the ammunition that was in the magazine (Gov't Ex. 3C). The Government also introduced into evidence a photograph of the exterior of the Cadillac that Officer Lanter took on the morning of May 10, 2008 (Gov't Ex. 2A), a photograph Officer Lanter took from the driver's side of the Cadillac and showing the interior back seat of the car (Gov't Ex. 2B), and a photograph of the rifle with the magazine removed, which photo was taken by Officer Lanter when he returned to the police station. (Gov't Ex. 2C). Officer Lanter testified that he took the photograph submitted as Government Exhibit 2B after he removed the weapon from the car. He testified that the rifle had been on the floor of the car with the butt near the Wendy's cup visible in the photograph.

the incident, tagged the gun and bullet, and sent them to the lab for testing to confirm that the bullet recovered from the wall came from the rifle in the Cadillac.[3]

Under cross examination, Officer Lanter testified that when he walked with Lee to the front of the Cadillac, Lee was not free to leave but was being detained for an investigation. The officer testified that the other two men–the one standing by the car and the other standing across the street, also were being detained at that point. Officer Lanter admitted that he did not ask Lee why he had gone into the house. Officer Lanter also admitted that although Lee said he had not been in the Cadillac, the officer did not indicate in his arrest report, his interview with a task force officer, or his trial preparation report that Lee had made such a statement.

The cross examination of Officer Lanter revealed an inconsistency between what the officer testified that Elliott told him regarding the Cadillac and what Elliott wrote in her written statement regarding the incident. Specifically, Officer Lanter testified that Elliot told him she gave the car to Lee; her written statement, however, does not indicate that she gave the car to Lee. Rather, Elliott's written statement indicates only that she had not had possession of the car keys in over a month. Elliott's boyfriend was in the passenger seat of the Cadillac when the officers arrived on the scene. Officer Lanter admitted that he did not ask, and Elliott did not tell him, that Lee had the gun or had fired the weapon. The officers did not find any bullets on Lee or in the car, and the rifle was not tested for fingerprints. Officer Lanter testified that he questioned Elliott's boyfriend and the individual across the street that evening, but he could not recall if he asked them who fired the gun or whose gun it was.

---

[3] The Government did not admit into evidence the slug recovered from the residence at 1695 Westwood or the official crime laboratory report associated with the firearm.

## II. ANALYSIS

Defendant Lee moves the Court to suppress the evidence and statements obtained on the morning in question. The Government responds that Lee's detention, arrest, and the officer's seizure of the rifle were valid.

### A. The Stop

Lee contends that Officer Lanter did not have reasonable suspicion to detain him when he came out of the house on Montrose Street and, accordingly, that the detention violated Lee's Fourth Amendment rights. The facts known to Officer Lanter at the time he escorted Lee out of the house and to the Cadillac were that: (1) shots had been fired by a subject standing by a vehicle in the middle of Montrose Street; (2) when he arrived on the scene a Cadillac was parked on Montrose with two individuals inside and one standing near the vehicle; and (3) Lee exited the Cadillac and walked briskly into the house when the cruiser pulled down the street. According to Lee, these facts were insufficient to create reasonable suspicion. Lee further argues that the Government cannot contend that he was knowingly fleeing from an officer because Officer Lanter never turned on the overhead lights on the cruiser.

The Court's first step in analyzing the constitutionality of Officer Lanter's conduct on the morning in question is to determine the nature of the interaction between Lanter and Lee.

> There are three categories of interaction between police and citizens: consensual encounters, temporary detentions (or *Terry* stops), and arrests. The Fourth Amendment applies only to the latter two. Thus, a police officer must have a reasonable suspicion to conduct a temporary detention or probable cause to conclude an arrest, while no objective justification is required to initiate a consensual encounter. *See United States v. Flowers*, 909 F.2d 145, 147 (6th Cir. 1990).

*United States v. Ushery*, 968 F.2d 575, 578 (6th Cir. 1992). Under this standard, Officer Lanter did not need an objective justification to initiate a consensual encounter with Lee when Lanter arrived on the scene. Officer Lanter testified that when he asked for Lee, Lee voluntarily came to the door of the residence, and that Lee voluntarily and without assistance walked to and stood in front of the Cadillac when Lanter asked him to.

> The test for whether an encounter with the police constitutes temporary detention is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." . . . "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."

*Id*. at 578-79 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Applying this test to the evidence, the encounter between Lee and Lanter would appear to be consensual up to the point where Lee was standing in front of the Cadillac: a reasonable person in Lee's position would have believed he was free to disregard Officer Lanter's questions or simply walk away. However, during his cross-examination testimony, Officer Lanter stated that Lee was not free to leave at the point that Lee exited the residence at 1691 Montrose Street, even though he never told Lee that he was not free to leave. Because of this testimony, the Court must conclude that from the time Lee exited the residence, Officer Lanter was engaged in a *Terry* stop of Lee, triggering the protections of the Fourth Amendment.

The issue thus becomes whether, at the time Lee came to the door of the residence, Officer Lanter had reasonable suspicion to temporarily detain Lee. "The determination of whether a reasonable suspicion exists 'is to be based upon all the circumstances' surrounding the stop, and is a less demanding requirement than probable cause." *Ushery*, 968 F.2d at 579

7

(internal citations omitted). If Officer Lanter did not have reasonable suspicion that Lee was engaged in criminal activity at the point that Lee exited the residence, then the investigative stop was unconstitutional, and "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source." *Mapp v. Ohio*, 367 U.S. 643, 654 (1961). "This 'exclusionary rule' is supplemented by the "fruit of the poisonous tree" doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). However, as the Sixth Circuit explained in *Pearce*, to exclude evidence under these constitutional doctrines, "the defendant must show more than 'the mere fact that a constitutional violation was a "but-for" cause of [the police's] obtaining [the] evidence.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)). Rather, the question is–assuming the illegality of the search or seizure–whether the evidence discovered was "come at by exploitation of the illegality" or by means sufficiently distinguishable from the illegal act such that the evidence is "purged of the primary taint." *Id.*

Upon its review of all the evidence, the Court concludes that Officer Lanter did not have a sufficient basis for temporarily detaining Lee at the time he exited the residence on Montrose Street. This case bears certain similarities to *United States v. Patterson*, 340 F.3d 368 (6th Cir. 2003) and *United States v. Baldwin*, 114 F. App'x 675 (6th Cir. 2004) (unpublished). In *Patterson*, the Sixth Circuit concluded that police offers lacked reasonable suspicion for a *Terry* stop of the defendant when, acting on an anonymous tip from a drug hotline, they went to a particular street corner and observed the defendant's companion throw an object away after seeing the officers approach. *Patterson*, 340 F.3d at 370-72. In reaching its conclusion, the

Sixth Circuit emphasized that the officers lacked an individualized suspicion that *the defendant* was engaged in wrongdoing. *Id*. The defendant was one of eight men standing at the street corner, all of whom began walking away from the officers when they arrived at the scene. The court found that the police lacked individualized suspicion to stop the defendant when he was merely one of a group. The court also dismissed outright the notion that the act of walking away from the police car constituted a factor for consideration in determining the totality of the circumstances, finding the behavior innocent: "Walking the opposite direction from the police could be considered an indication of a person's fear of being caught participating in illegal activities, but it also could be purely innocent activity." *Id*. at 371. In the present case, Officer Lanter observed three men either in or near the Cadillac that was parked on Montrose. The officer followed Lee to the residence and asked him to come outside. At that point, under the totality of the circumstances, Officer Lee did not have a basis for an individualized suspicion concerning Lee as opposed to the other two individuals in or near the Cadillac and, as in *Patterson*, the Court finds that Lee's mere act of walking away from the officer's patrol car was insufficient to create reasonable suspicion that Lee was engaged in criminal activity.

In *Baldwin*, the Sixth Circuit found that the police lacked reasonable suspicion to detain the defendant when the police heard gunshots in a particular area, briefly followed an individual fleeing from that area, and then came across the defendant in his car after losing the trail of the fleeing individual. 114 F. App'x at 679-81. In reaching that conclusion, the court noted that "[e]ven if the fleeing pedestrian may have been involved in the shooting incident . . . there has been no showing of any specific, articulable facts which gave rise to a reasonable suspicion that [the defendant] was connected to the firing of the gunshots." *Id*. at 680. This case is similar:

9

Officer Lanter knew gunshots had been fired in the area, but at the time he observed Lee go into the house on Montrose, Officer Lanter was aware of no specific facts which could have given rise to a reasonable suspicion that Lee, individually, was in any way connected with the reported shots fired. Therefore, the Court finds that Officer Lanter's *Terry* stop of Lee was unsupported by reasonable suspicion.

The fact that Officer Lanter's detention of Lee violated the Fourth Amendment does not automatically render all subsequently discovered evidence and statements inadmissible, however. As explained below, Officer Lanter's discovery of the rifle in plain view in the back of the Cadillac was inevitable, and that inevitable discovery not only removes the taint from the discovery of the weapon, it provided Officer Lanter with probable cause to place Lee under arrest.

### B. Inevitable Discovery and Subsequent Arrest

Lee argues that his arrest was not supported by probable cause. The only additional fact available to Officer Lanter between the time he detained Lee and placed him under arrest was that there was a rifle in plain view in the back of the Cadillac. The officer did not ask anyone whose gun it was or if anyone had fired the gun. Thus, according to Lee, it was not reasonable for Officer Lanter to conclude that Lee was engaged in criminal conduct.

The Court disagrees with Defendant. Once Officer Lanter observed the assault rifle in plain view in the vehicle that Lee had just exited, the officer had probable cause to arrest Lee. *See*, *e.g.*, *Pearce*, 531 F.3d at 382 (noting that the officer had probable cause to arrest the defendant and search the vehicle after the officer observed a gun magazine in plain view on the passenger-side floorboard of the car which the defendant had just exited). The officer's

discovery of the weapon was not, in this case, discovered as a result of the exploitation of Lee's unreasonable detention. Rather, Officer Lanter inevitably would have discovered the rifle in the routine course of his investigation.

The "inevitable discovery" doctrine provides that evidence obtained during the course of an unreasonable search and seizure will not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation. *Nix v. Williams*, 467 U.S. 431, 447 (1984). "The burden of proof is on the government to establish that the tainted evidence 'would have been discovered by lawful means.'" *United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003) (quoting *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996)). "[T]he government can meet its burden of showing that the tainted evidence inevitably would have been discovered through lawful means 'by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence.'" *Id*. (quoting *United States v. Kennedy*, 61 F.2d 1392, 1399 (9th Cir. 1989)).

In this case, Officer Lanter responded to a "shots fired" call where a 911 caller had reported shots fired from an individual standing by a vehicle in the middle of Montrose Street. Officer Lanter testified that, after he asked Lee to walk back to the car, he walked around the car because he was "curious" because the call said that shots came from beside a car on Montrose. Officer Lanter then saw the rifle because it was in plain view in on the rear floorboard of the car.

Officer Lanter's testimony demonstrates that it would have been routine for the officer to walk around and look into a car that was parked on the street when a 911 caller had just reported seeing an individual fire shots from near a car, and when the officer had just observed an individual walk away from the car and two others standing near the vehicle at approximately

3:30 a.m. Officer Lanter testified that the rifle was completely exposed and that "any trained eye" could tell it was an assault rifle. Furthermore, the officer testified that he could see that the ammunition clip was in the rifle and that it is illegal to transport a loaded weapon in a vehicle in that manner.

Given this evidence, the Court finds that Officer Lanter inevitably would have discovered the rifle even if the officer had not unlawfully detained Lee when he exited the residence on Montrose Street. Under the totality of the circumstances, the officer's discovery of the loaded weapon, which was in plain view, gave Officer Lanter probable cause to place Lee under arrest.

## C. Plain View

The Court now must determine whether Officer Lanter's seizure of the rifle that was in the Cadillac was permissible in the absence of a warrant. The plain view exception permits the warrantless seizure of an object provided that (1) the officer is lawfully positioned in a place from which the object can be plainly viewed; (2) the incriminating character of the object is immediately apparent; and (3) the officer has a lawful right of access to the object itself. *See Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003). There is no reasonable dispute that the facts of the case satisfy the first and second elements of the plain view exception: Officer Lanter was lawfully in the street when he observed the rifle in plain view in the back of the car, and the incriminating character of the loaded assault rifle was immediately apparent. The Court also finds that the third prong of the test was met in this case as well.

Once Officer Lanter observed the rifle in the car, reasonable suspicion developed to justify a *Terry* stop of Lee and a search of the car. *See Michigan v. Long*, 463 U.S. 1032, 1049

(1983) (extending *Terry* to the search of the passenger compartment of an automobile). "Police officers may search areas in a vehicle where a weapon may be placed or hidden if the officers possess a reasonable belief, based on specific and articulable facts, that the suspect is dangerous and the suspect may gain immediate control of weapons. *United States v. Terrell*, 95 F. App'x 746, 748 (6th Cir. 2004) (unpublished opinion) (citing *Long*, 463 U.S. at 1049). "If a reasonably prudent person would believe that his safety, or that of others, was in danger, then the officer may conduct a search of the passenger compartment." *Id*.

In *Terrell*, the Sixth Circuit held that police properly conducted a search of the vehicle of the defendant, who got out of his car and shut the door as police approached him to talk to him about a possible burglary, where within 30-45 seconds of beginning their burglary investigation, one police officer observed a gun partially under the driver's seat and readily available to the suspect. 95 F. App'x at 748. The defendant in that case argued that he did not pose a risk to the safety of the officers because he sat in the back seat of the police car when the officer removed the gun from his car. The Sixth Circuit rejected that argument, relying on the precedent of *Long*, in which the Supreme Court noted that during an investigative detention, "a *Terry* suspect in Long's position [might] break away from police control and retrieve a weapon from his automobile . . . . In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id*. (quoting *Long*, 463 U.S. at 1051.)

Officer Lanter testified that he was concerned for his safety after he observed the assault rifle in the back of the vehicle that Lee and another passenger had just exited. *Terrell* is sufficiently analogous to this case to dictate the conclusion that Officer Lanter had a lawful right

13

of access to the rifle itself because its continued presence in the unlocked Cadillac posed a threat of harm to the officers as Lee and two other individuals remained in the immediate vicinity of the car (and therefore the weapon).

### D. Statements

Lee does not dispute that Officer Lanter orally informed Lee of his *Miranda* rights. However, he contends that Officer Lanter overlooked a step when he did not ask Lee if he wanted to waive those rights prior to his interrogation of Lee. This argument is without merit.

The warnings set out in *Miranda v. Arizona*, 384 U.S. 436 (1966), ensure that a suspect knows of his rights not to talk to the police, to have a lawyer present, and to discontinue talking at any time, and ensure that the suspect is apprised that his statements can be used to secure his conviction. *Stanley v. Lazaroff*, 82 F. App'x 407 (6th Cir. 2003) (citing *Moran v. Burbine*, 475 U.S. 412 (1986)). In addition to the duty to inform an accused of his rights, "*Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings. 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease.'" *Moran*, 475 U.S. at 420 (quoting *Miranda*, 384 U.S. at 473-74).

A defendant can waive these rights, but *Miranda* requires that the waiver be voluntary, knowing, and intelligent. 384 U.S. at 444. It is the government's burden to establish a waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The evidence presented at the suppression hearing is that Officer Lanter orally recited the *Miranda* warning to Lee and asked him if he understood those rights. Officer Lanter testified that Lee said that he understood his rights. After giving Lee the *Miranda* warning, Officer

Lanter put Lee in the police cruiser and proceeded to question him about the rifle. Lee made statements in response to this questioning. Lee does not allege, and there is no evidence to indicate, that Officer Lanter coerced Lee in any manner during this questioning.

Contrary to Lee's suggestion, *Miranda* does not require that an officer ask the accused if he would like to waive his rights prior to initiating any questioning of the accused. Neither does an accused's waiver of his rights have to be express. *North Carolina v. Butler*, 441 U.S. 369 (1979) (establishing the doctrine of implied waiver). In *Butler*, the Supreme Court held that, absent an express waiver, a court must presume that a defendant has not waived his right to remain silent. *Id*. at 373. Nevertheless,

> [t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*Id.* As explained by the Sixth Circuit, "[o]ne such case where waiver may be clearly inferred is when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights. For, while it does not require much to invoke the right to silence, it does require something that indicates a desire not to be questioned." *United States v. Nichols*, 512 F.3d 788, 797 (6th Cir. 2008). "Thus, a failure to invoke one's right to remain silent–after being informed of and indicating an understanding of that right–functions as a waiver." *Id*.

Lee did nothing to invoke his right to remain silent, and he did not indicate in any manner that he did not wish to be questioned. The fact that Lee indicated that he understood his rights

15

yet proceeded to answer Officer Lanter's questions about the rifle operates as an implied waiver of his right to remain silent.

## III. CONCLUSION

For the reasons stated above, the assault rifle seized in connection with Officer Lanter's investigation as well as the statements that Lee subsequently provided to the officers are admissible. Accordingly, Defendant's Motion to Suppress (doc. 17) is **DENIED**.

IT IS SO ORDERED.

    s/Susan J. Dlott
Susan J. Dlott
Chief Judge, United States District Court